E8d6proo

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PROGENICS PHARMACEUTICALS,
     INC.,
 4
                     Plaintiff,
 5
              v.                           14 MISC 245(RA)
 6
     IMS CONSULTING GROUP,
 7
                     Defendant.
 8
     ------------------------------x
 9                                         New York, N.Y.
                                           August 13, 2014
10                                         3:00 p.m.

11   Before:

12                      HON. RONNIE ABRAMS,

13                                         District Judge

14                          APPEARANCES

15   MARC J. GOLDSTEIN
          Attorney for Plaintiff
16
     PILLSBURY WINTHROP SHAW PITTMAN, LLP
17        Attorneys for Defendant
     BY:  KENNETH W. TABER
18        ANDREW KIM

19
     GREENBERG TRAURIG
20        Attorney for Non-Party ONO Pharmaceutical
     BY:  LORING I. FENTON
21

22

23

24

25
```

E8d6proo

1              (In open court; case called)

2              THE DEPUTY CLERK:  Counsel please state your name for

3     the record.

4              MR. GOLDSTEIN:  Marc Goldstein for Progenics

5     Pharmaceuticals.

6              THE COURT:  Good afternoon.

7              MR. TABER:  Your Honor, Ken Taber and Andrew Kim for

8     IMS Consulting Group.

9              THE COURT:  Good afternoon.

10             MR. FENTON:  Good afternoon, your Honor.  Loring

11    Fenton for non party Ono Pharmaceutical.

12             THE COURT:  I received your submissions and I am happy

13    to hear you out.

14             Do you want to start, Mr. Goldstein?

15             MR. GOLDSTEIN:  I will be happy to start, your Honor.

16             THE COURT:  Sure.

17             MR. GOLDSTEIN:  I would like to jump right into the

18    issue of your Honor's power to enforce the subpoena.  There is

19    a subsidiary issue which isn't very developed of the

20    arbitrator's power to issue the subpoena, but I think this is

21    about your power to enforcements.  So I would like to go right

22    to the language of Section 7 of the Arbitration Act concerning

23    enforcement power and the relevant language says that the court

24    may compel the attendants of such person or persons before said

25    arbitrator or arbitrators (ellipsis) in the same manner

E8d6proo

1    provided by law for securing the attendance of witnesses in the

2    Courts of the United States.

3              Now, we have this issue about 30(b)(6) and I want to

4    jump right into it because I can imagine it occurred to your

5    Honor in reading what Judge Wesley wrote in the Life

6    Receivables decision Section 7 is a statute that dates from

7    1925.  It is 13 years older than the Federal Rules.  It dates

8    from a time when there was no such thing as a non-party

9    subpoena for documents only and no such thing as a deposition

10   for prehearing discovery.  Judge Wesley in his opinion pointed

11   that out as support for reading the plain meaning of the

12   language that said the witness has to be called to appear

13   before in the presence of one or more of the arbitrators as the

14   subpoena provides.  Of course that is not to say that

15   depositions were entirely unheard of before the Federal Rules,

16   and I am going to refer the Court to an article which we

17   discovered today and I sent it to counsel.

18             It is in the Yale Digital Commons, the Digital Commons

19   website, www.DigitalCommons.Law.Yale.EDU.  The author's name is

20   Siwller, and the title of the article is The Origins of the

21   Oral Deposition in Federal Rules.  So I was instructed because

22   it took us back to what was deposition practice in the Federal

23   Rules and the judiciary law such as it was before we had the

24   Federal Rules, which is to say at the time the FAA was enacted.

25   It was interesting to read that because there was a provision

E8d6proo

1    by rule on the equity side.  It was Equity Rule 47 for

2    depositions in lieu of trial testimony when authorized by

3    statute or for good cause shown and there were two separate

4    statutes in 28, U.S.C. -- I think it was -- 638 and 639 and you

5    will see in the footnote of that article that provided for

6    depositions to perpetuate trial testimony and they had Latin

7    terms, *i bene esse*, which most of us are familiar with from

8    either law school or some early part of our careers, and the

9    other which is called *dedimus potestatem,* which was more or

10   less when the witness was about to flee the country or become

11   unavailable other than for some unpredictable period of time.

12            The article also says that those provisions apply to

13   non-parties.  Sometimes those proceedings took place before

14   masters who supervised the examination.  I point out the

15   masters provision because it is interesting when one rereads

16   the text of Section 7 carefully, the witness fee to be paid on

17   service of the arbitral subpoena is not the fee payable to a

18   witness to appear to testify at the trial before your Honor.

19   It is the fee associated with an appearance before a master

20   from way back when in 1925.  So there is some good historical

21   support that the framers of Section 7 back in 1925 had in mind

22   not just the arbitration hearing on the merits as an analogue

23   to a trial in the federal court but a special arbitration

24   hearing before fewer than all the arbitrators -- and that is

25   what we have here, a plan at the moment, an agreement between

E8d6proo

1    Mr. Fenton and myself that one arbitrator will attend.  It is

2    an analogue to a proceeding under federal equity rules as they

3    were and 28 provisions as they were for depositions for the

4    perpetuation of testimony that would be later used at the

5    trial.

6            Now, you would still like to know I assume how

7    30(b)(6) gets into this discussion and as 30(b)(6) is clearly a

8    Federal Rules provision post-1938 and here is why:  There are

9    two particular sections of Section 7 that are not frozen in

10   time, not frozen and to be read according to what was in

11   judicial practice in 1925.  That is because those provisions

12   cross-referenced law and rules and thus are properly read to

13   reference those laws and rules as they might be changed.  We

14   started out by reading in the same manner provided by law for

15   securing the attendance of witnesses.  Obviously Congress had

16   in mind not only how attendance was secured in 1925 but as it

17   might be secured in the future when those laws might be amended

18   by Congress to update practice in the federal courts.

19           That is what happened.  Congress updated practice in

20   1938 and they created Rule 30(b)(6) and 30(b)(6) then became

21   one of the methods provided by law for securing attendance of

22   witnesses in the courts of the United States and that we

23   pointed out in the brief and so I don't need to belabor it that

24   the language in the statute talks about securing the attendance

25   of witnesses in courts.  It doesn't say securing the attendants

E8d6proo

1   of non party witnesses at trial for trial testimony in the

2   courts.  Perpetuation of testimony rather under Rule 30(b)(6)

3   or in this one arbitration hearing we have on the calendar for

4   August 25th is the taking of testimony.  So there is an

5   analogue directly to Rule 30(b)(6).

6        Now, I only want to pause briefly on the question of

7   arbitral power.  That is the lay of the land in terms of

8   judicial power.  In terms of arbitrator I pause briefly only to

9   say that we have what amounts to a 30(b)(6) type of subpoena to

10  a corporate witness, and in our brief we cited the Dictionary

11  Act.  I didn't know there was Dictionary Act.  It says right

12  there in 1, U.S., 1 as I quoted it that unless the context

13  indicates otherwise, a person in a statute of the United States

14  means a natural person and corporation, partnership, entity,

15  etc., etc.  So there is no question that person or persons as

16  used in Section 7 of the Federal Arbitration Act includes a

17  corporation.  Even if the subpoena had not directed the

18  corporation to designate, a corporation properly served in the

19  arbitral subpoena would have to designate.

20        That really brings us then to the main question of the

21  day, your Honor, because I don't think the question is whether

22  you have the power to enforce the subpoena.  I think it is

23  clear that you do.  I think it is clear that 30(b)(6) is an

24  appropriate analogue.  I think the submission made by our

25  adversary Mr. Taber that Rule 45 doesn't bring into play

E8d6proo

1   30(b)(6) was inconclusive as his brief and mine both

2   recognized.  We cited a case in which it was so recognized.

3   But I think that doesn't matter because we're not only talking

4   about an analogue to bring a witness in for trial.  We're

5   talking about an analogue perpetuating testimony for use of

6   trial.  So 30(b)(6) is a perfectly good analogue.

7         So it really brings us to the question of burden.  You

8   have Judge Scheindlin's opinion.  We've quoted it.  We

9   discussed it.  I only want to point out that that opinion has

10  popularity this week.  In a case two recent have been cited

11  yesterday because it was cited by a federal district judge in

12  Nevada on Monday.

13        THE COURT:  Was that 30(b)(6) case?

14        MR. GOLDSTEIN:  Yes.  The case is NML Capital LTD v.

15  the Republic of Argentina, 2014 WL 3898021 at *10, and the

16  discussion at *10 quotes specifically Judge Scheindlin's

17  discussion of the obligation to educate a witness in the

18  jurisdiction to give testimony.  They relied on that in

19  enforcing the subpoena to require the out-of-state persons with

20  knowledge to educate a witness within the body who could

21  testify in response to the subpoena.  So Judge Scheindlin got

22  some approval there.

23        So with that I just want to go to the question of

24  burden directly.  I think the question of burden, whether it is

25  undue or not, can fairly be stated this way:  Is the cost and

8

E8d6proo

1    effort involved to educate a New York witness so great that the

2    cost is prohibited, that is to say IMS is de facto compelled to

3    make the witness in Japan appear by video conference to

4    testify.  That is the back door argument they make.  I can

5    conceive of the back door argument making sense that the cost

6    to educate the New York witness is so prohibitive that there is

7    a de facto compulsion to make the witness in Japan a witness.

8         Now, the answer to that question, whether there is

9    that level of compulsion, is no for several reasons.  First,

10   IMS has a consulting agreement with Ono, the respondent.  IMS

11   was paid for the first report that was made as the alleged

12   basis to terminate the contract.  IMS was paid for the second

13   report in May of this year that was generated during the

14   arbitration for use as evidence.  It is inferrable that IMS

15   will be paid by Ono for its time spent as a witness.  It is a

16   further element of their consulting engagement.

17        Second, IMS has Ono's help to get ready.  Their client

18   Ono, in Japan, plus Ono's counsel, in the New York and Japan,

19   they are in privity.  That is an extraordinary level of support

20   to facilitate the New York witness getting ready.

21        Third, we have given fairly precise directions on the

22   issues we want to cover in the oral testimony.  If I stray, if

23   we stray into details that go well beyond that and the witness

24   says, I didn't prepare to answer that question, then the

25   witness doesn't testify to that matter.  Then it is up to the

E8d6proo

1    arbitrators to decide if we ask for an adverse inference

2    whether the witness reasonably should have been ready to answer

3    that question.  So Mr. Ashman's declaration and counsel's

4    argument about how complicated the report was and how involved

5    was IMS's field work for their labor of work is really one of

6    those classical logical fallacies of arguing a parade of

7    horribles in the extreme.  It is really never going to come to

8    pass.  We have specified the subjects for the deposition in a

9    narrow and reasonable way.  If the witness fails to get

10   educated for a question that might go beyond the bounds of

11   that, they would have a good argument that we really didn't

12   need to prepare for that and we didn't and no adverse inference

13   could be drawn.

14          Now, I want to finish by stating the obvious that the

15   test is not just burden but undue burden.  An undue burden

16   relates not only to the factors that I have just discussed but

17   it takes into account the probative value of the evidence and

18   the proponent's need for the evidence.  IMS has nearly nothing

19   to say on those points because there really is nothing for them

20   to say.  Their two reports are at the heart of the arbitration.

21   All of Ono's witnesses and Ono's expert economists, they all

22   testify about what IMS did and Ono's people in their written

23   witness statements -- two rounds of it now -- testify about

24   what they talked about with IMS in meetings before and during

25   and after the reports.

E8d6proo

|   |   |
|---|---|
| 1 | THE COURT:  The witnesses are in Japan. |
| 2 | MR. GOLDSTEIN:  Those witnesses are in Japan and they |
| 3 | will come to be cross-examined.  Progenics is prejudiced |
| 4 | without the testimony especially because as your Honor knows |
| 5 | hearsay goes into the record so automatically in the |
| 6 | arbitration so we already have a written record filled with |
| 7 | hearsay testimony about what IMS allegedly said and why IMS |
| 8 | allegedly did things as they did.  So we need this testimony |
| 9 | for the arbitration to be a fair arbitration.  That is an |
| 10 | important part of the balancing when you consider whether there |
| 11 | is an undue burden. |
| 12 | Thank you, your Honor, for your attention. |
| 13 | THE COURT:  Thank you. |
| 14 | MR. TABER:  Thank you, your Honor.  I have six points |
| 15 | I would like to make.  I will try to make each of them very |
| 16 | quickly.  First point: Mr. Goldstein has now had three briefs |
| 17 | before your Honor in which to give the Court one case, just one |
| 18 | case, in which what he is asking for has been done by a court |
| 19 | anywhere.  What he is asking for is the use of Rule 30(b)(6) to |
| 20 | compel us to educate a witness who doesn't know anything about |
| 21 | the subject matter at hand to testify at an arbitral hearing |
| 22 | here in New York when everyone admits that the people who know |
| 23 | about the subject matter are beyond the 100-mile limit of the |
| 24 | subpoena power of this court and of the arbitral tribunal. |
| 25 | There isn't a single case he can point to where that has ever |

E8d6proo

been done in the 75 years of Rule 30(b)(6) being in play.  The

reason why, your Honor, is that that device in that context

makes no sense.  What has been said in many cases, and we cite

them in our papers, is that the arbitral subpoena range is

100 miles to find knowledgeable witnesses who can testify about

things about which they know.  No case has said, And if there

are no knowledgeable witnesses, you must educate them.  To the

contrary, your Honor, we cite two cases.  One from the D.C.

District Court in particular involving BBC, which had a news

bureau in Washington D.C. but the people who new about the

issue that was before the Court, which was the notion of

out-takes from a BBC broadcasting were all in London, and there

was -- this was in the setting of just a deposition, not even a

trial setting.  There was an attempt to compel the presentation

of a witness within the 100 miles and BBC said, No, we have no

such witness who has that knowledge, and court agreed and

quashed the subpoena.

        THE COURT:  Let me just ask you a basic question.  I

understand that the arbitrator did not order anyone in Japan to

participate by way of video conference, but do you think that

the arbitrator even had the power to do that?

        MR. TABER:  I don't.  I don't.  I think that the

arbitrator had the power to have 100 miles' worth of a radius

to find witnesses and the arbitrators appropriately exercised

that power and clarified when we submitted our objection that

E8d6proo

1    that was all they intended to do.  They didn't see their power

2    as any broader to reach witnesses in Japan.  Now, there may be

3    some procedure by which the panel could get on an airplane and

4    go to Japan and utilize the comity of the Japanese court system

5    in order to have the equivalent of a subpoena issued in Japan

6    in U.S. Court proceedings.  That hasn't happened here.  I don't

7    know if it could have happened here frankly, but there is no

8    doubt it hasn't happened here.

9           We all know in any litigation there are sometimes

10   witnesses who are beyond the reach of the Court and cannot be

11   compelled to come to court to testify.  That is this case.

12   There is no witness at IMS in New York who knows anything about

13   this particular project.  750 hours were spent on the project.

14   Every one of those hours was spent by someone in Tokyo.  Nobody

15   in New York knows about the project.

16          Let Me if I may go to my second point.

17          THE COURT:  Absolutely.

18          MR. TABER:  Mr. Goldstein tells us in his submission

19   to the Court yesterday that it shouldn't matter to this Court

20   whether the testimony at issue here is going to be worthless

21   testimony or not.  That is an issue for the arbitrator he says

22   and I respectfully disagree.  The standard that is applicable

23   here is whether there is a significant need for the testimony

24   in question.  I am assuming that he gets over his 30(b)(6)

25   problem.  I don't think he does, but let's assume he does.  The

E8d6proo

1    test then is whether there is a significant need for the

2    testimony.

3         THE COURT:  Are you denying that there is a

4    significant need for the testimony of a witness in Japan, or is

5    your argument just that having a witness who is educated on an

6    impromptu basis wouldn't provide the useful testimony that

7    Progenics is seeking?

8         MR. TABER:  The second, your Honor.  No, there are

9    clearly witnesses in Japan who have information that would

10   appear from everything we know to be relevant to the dispute

11   between these parties.  The educated witness in the U.S. who

12   will no nothing other than hearsay from conversations with

13   other people and who is not in a position because IMS is not a

14   party to give admissions or make admissions that would overcome

15   the hearsay rule is in effect giving testimony that is no more

16   valuable than if we took someone off the street and put them in

17   a room for a couple days and have them talk to someone in Japan

18   about the project and then brought them into testify.

19        THE COURT:  Well, IMS could produce someone with

20   useful information either by way of video conference or have

21   someone from Japan come, but IMS is unwilling to do so.

22        MR. TABER:  We're unwilling to do so because we're not

23   obligated to do so, your Honor.  This is not our fight.  We're

24   a non-party.  The reach of the subpoena is 100 miles.  The

25   arbitrators have already said, No, we don't want a video

E8d6proo

conference from Japan.  That is off the table as far as

arbitrators are concerned.

            THE COURT:  Have they specifically said that as to

video conference?

            MR. TABER:  I will read you exactly what their words

were, your Honor.  What they said is -- they don't use the word

"video conference."

            MR. GOLDSTEIN:  The subpoena uses the word video

conference.

            MR. TABER:  What they say is, For the record it was

not the intention of the tribunal to require the appearance of

a witness in Japan.  If a witness is participating by video

conference in a U.S. proceeding, the witness is appearing in

Japan at one end of the video conference link.  I believe they

say quite clearly they don't want that and so does

Mr. Goldstein frankly.  In his submission, his first submission

to the Court, he says we're not asking for a video conference

in Japan, and we understand that the arbitrators said we can't

have that.  That was something that I suppose he must have

raised at some earlier stage.  I don't know.  We weren't there.

It is clear from his papers that he believes he is not entitled

to it and we concur.

            THE COURT:  I agree.  I am not being asked to decide

whether a witness in Japan could be compelled to testify by

video.  That is not the issue I am deciding today in any event

E8d6proo

1    so please proceed.

2                    MR. TABER:   Thank you, your Honor.

3                    The third point I want to make is with respect to

4    Mr. Goldstein's argument in his paper that the way we can do

5    this is in effect with a phone-a-friend, have someone in New

6    York who has necessary phone somebody in Japan to find out

7    whatever the information is in order to be able to testify.  My

8    only comment there, your Honor, is it just can't work in the

9    trial setting.  The notion you are going to ask a question of a

10   witness who isn't going to know the answer, you are going to

11   take a break while the witness calls someone in Japan and ask

12   the question is ludicrous.  I don't think that that is what

13   Mr. Goldstein meant to suggest.  I point it out only because it

14   underscores that the procedure he is asking for here

15   unprecedented as it is is also completely impractical in the

16   real world.

17                   Fourth point, your Honor.  Mr. Goldstein says there is

18   no undue burden here, that this is just business and the Court

19   should overlook that.  Respectfully, your Honor, it is not just

20   business to say to someone who has never touched a project,

21   never worked on that project, doesn't know the Japanese health

22   care system, doesn't know the Japanese language to come in an

23   educate themselves in some fashion to answer Mr. Goldstein's

24   question which are wide-ranging questions and he lays them out

25   in his papers.  He is not shy.

E8d6proo

1        THE COURT:  The part where he says in his papers if

2    you want to avoid that burden, produce someone by video

3    conference from Japan.

4        MR. TABER:  He does say that in his papers, your

5    Honor, but he is not entitled to that and I believe he cannot

6    foist upon us an undue burden and say, Of course there is an

7    answer for your undue burden, which is to give me something you

8    know and I know I am not entitled to.  It doesn't work that

9    way.  There is an undue burden because what he is proposing

10   which is the only thing he is allowed by the panel to propose

11   is the use of a witness in New York who knows by everyone's

12   agreement nothing about the subject of the testimony they are

13   being called on to give.  That is, I believe, your Honor, the

14   paradigm of an undue burden, to have to take a human being who

15   knows nothing about something and turn them into someone who is

16   going to testify live under oath.  To say, well, yeah, you can

17   avoid that by having a witness in Japan is not an answer either

18   the tribunal thinks is appropriate or Mr. Goldstein believes he

19   is entitled to because he is not.

20        The fifth point was to talk about the video

21   conferencing and I think we covered that more than adequately.

22        The last point relates to the case citing Judge

23   Scheindlin's case for 30(b)(6), which was just apparently

24   handed down within the last couple days.  That is a case

25   involving Argentina decided by the District of Nevada.  All

E8d6proo

1   that case does, your Honor, is it recites the Rule 30(b)(6)

2   standard.  It's a deposition case, not a trial case.  So it is

3   still the fact that there is nothing further on the trial side

4   of the equation.  It is not an arbitration case and so it

5   doesn't change anything that the cases that we described in our

6   papers established.

7           I would also add that in that case the only question

8   that was put to the deposition witness or was going to be put

9   to the deposition question was whether and why particular

10  documents exist or don't exist.  That is the kind of question

11  that somebody can prepare for and answer on behalf of a

12  corporation, the existence of a body of documents, whether they

13  exist, and if they don't exist where are they in effect.  That

14  is not what Mr. Goldstein is asking for here.  What he is

15  asking for here is substantive testimony -- What did you in the

16  study, what didn't you do in the study, why did you do it, or

17  why didn't you do it, why didn't you do a host of other

18  alternatives that I think you should have done.  Those are all

19  questions that can only be answered by someone who knows the

20  Japanese health care market generally and this particular

21  project in particular.

22          So, your Honor, if I could just sum up what we're

23  dealing with is, I believe, a completely unprecedented request

24  to use a mechanism that in 75 years has never previously been

25  used and that would impose even if it were proper an undue

E8d6proo

1  burden.  If the words undue burden mean anything, they mean

2  what Mr. Goldstein is asking this New York witness to do.

3          Thank you very much.

4          THE COURT:  Thank you.

5          Mr. Goldstein, would you like to respond?

6          MR. GOLDSTEIN:  Yes, your Honor.

7          Sometimes replies take last points first so I will

8  take the new Nevada case first and I will read from it.  This

9  is at *10.  "Rule 45(c) territorial limits place no barriers on

10  the information that a properly served subpoena can reach.

11  Given the unique status of a corporate person, a federal court

12  subpoena power reaches all documents, no matter where they are

13  located, and that are within a resident corporation's custody

14  and control."  Then it goes to the testimony inside.

15  "Similarly, the unique status of the corporate person permits a

16  federal court to compel a non-party resident corporation to

17  designate a non-resident employee to 'thoroughly educate' and

18  in forum employee to testimony on the corporation's behalf."

19  Citing Wolves v. Bank of China, 298 F.R.D. 91, 99 and then

20  parenthetical quote of Judge Scheindlin, "Even Hapoalim is a

21  non-party witness and all the documents are knowledgeable

22  persons are in Jerusalem, compliance with 30(b)(6) subpoena is

23  not an undue burden."

24          THE COURT:  Let me ask you how useful would it really

25  be?  This is different.  Putting aside the issue of the

E8d6proo

1   distinction between 30(b)(6) and an arbitral subpoena, putting

2   that aside for a moment, how useful would it be in this case to

3   have IMS educate a witness who wasn't involved in the study on

4   questions raised about why did you do this in the study, why

5   didn't you do that?  Doesn't that require an expert's knowledge

6   of the study in the Japanese health care market?  It is very

7   distinct from something about the company or what the company

8   did.

9        MR. GOLDSTEIN:  It does not, your Honor, because the

10  questions are fairly pointed and they do not go to the

11  methodology or the field work of IMS.  They go to IMS's

12  communications with Ono.  As to which Ono's witnesses have

13  testified to what they said to IMS and what IMS said to Ono.  I

14  would like to ask, Did you in fact say that to Ono in the

15  meeting held on August 6th as Mr. X from Ono has testified.

16  There is no difficulty in witness statement of the Ono witness

17  being shown to the designee in New York who can discuss its

18  content with his counterpart in Tokyo and find out.  We have

19  other rather pointed questions which are again not about the

20  methodology.

21       THE COURT:  In terms of he has to find out from a

22  person in Tokyo isn't that an end run around the geographic

23  limitations that the idea being, all right, you have to

24  designate someone here who is going to call the person in

25  Tokyo?

E8d6proo

1          MR. GOLDSTEIN:  I think Judge Scheindlin is correct in

2     saying in effect it is not an end run around the geographic

3     limitations because the knowledge is held by the corporation.

4     It is only held by individuals on behalf of the corporation.

5     The corporation is present in New York.  It is jurisdictionally

6     here and therefore it is validly served.  These are devices to

7     get at the corporation's knowledge in the best way we can.

8     That notion of the geographic locus of the knowledge was

9     reiterated in what was written in the very first paragraph of

10    the judge of Nevada, Rule 45(c) territorial limits place no

11    barriers on the information that a properly served subpoena can

12    reach.

13          Judge Scheindlin's opinion elaborated on that.  The

14    corporation has the information.  The employees are in

15    different places and we cannot force the Japan employee to come

16    here, but we can force somebody here to get the information

17    from the Japan employee.  I pointed out earlier Mr. Taber

18    argued that the hearsay nature of what the Japan witness would

19    say to his colleague in New York makes it either inadmissible

20    or not useful.  I disagree with that.  It is hearsay in a

21    technical sense.  But if hearsay in a technical sense was

22    applying in arbitration, all the testimony of Ono about what

23    IMS said to them would be stricken out.  But it is not being

24    stricken out because hearsay goes in the record for what it is

25    worth in the arbitration.  So we have a significant need and

E8d6proo

1    there will be significant value.

2              I am going to skip over the phonathon on this point,

3    your Honor, because we were not suggesting that at all.

4              THE COURT:  I think we just addressed that.

5              MR. GOLDSTEIN:  The subpoena, your Honor, and Exhibit

6    11 says in the last sentence of page 1, Video conference

7    facilities will be available to accommodate the appearance to

8    give testimony of any person designated by you to testify.

9              THE COURT:  What page?

10             MR. GOLDSTEIN:  First page of the subpoena at Exhibit

11   11.  First of all, we scheduled by agreement for 6:00 p.m.

12   which is 7:00 a.m. in Tokyo in case they decided to designate a

13   witness in Japan.  That was part of the e-mail exchange among

14   the arbitrators and Mr. Fenton and me to select a time of day

15   that would accommodate the Japan witness if they elected to go

16   that route and then in the last sentence says, Video conference

17   will be available to accommodate the appearance.  So, yes, the

18   arbitrators had no intention to require anyone in Tokyo to fly

19   here and show up here.  They have no intention evidently to

20   require that the Japanese witness be designated.  They did

21   contemplate that the designee at IMS's election to avoid

22   burden -- to avoid the burden they are talking about of

23   educating somebody might be to opt for the video conference.

24             THE COURT:  They are not electing to do that.

25             MR. GOLDSTEIN:  Right.  They are not electing to do

E8d6proo

1   that.  They are not electing to do that and they can't be

2   compelled to bring the Japanese witness, but they are not

3   forced to bring the Japanese witness.  They have a meaningful

4   choice of educating a witness in a reasonable way.

5           THE COURT:  In your view they have a meaningful choice

6   of doing what you are requesting and educating someone not at

7   all knowledgeable about this study to essentially answer

8   questions about the study or to do what the arbitrator has

9   clearly not asked them to do and they cannot be required to do,

10  which is designate someone in Japan to participate by video

11  conference.

12          MR. GOLDSTEIN:  They can opt for that.  That was

13  precisely what Judge Scheindlin said.  They cannot be required

14  to do that; but the fact that they have the ability to do that

15  as an option -- that is a less burdensome option -- is relevant

16  to the question of undue burden.  They can choose that.  They

17  have an easy route to minimize burden to nothing.  The burden

18  involved in educating a witness in a reasonable fashion as I

19  said in the formula originally is not so overwhelming

20  especially in a context where it is really not disputed that

21  the people is going to be compensated for their time to get

22  ready in a reasonable way.  Your Honor is not going to direct

23  them to read every page of the report.  They will not be

24  expected to do that.  They will not be expected to know the

25  details of the field work that was done or the survey and the

E8d6proo

```
 1    design of the survey and the interviews and the physicians.

 2    That is not what it is about.  We have given you in our

 3    subpoena and in our brief a very specific definition of what we

 4    think the education involves and what we think the examination

 5    before the arbitrator involves.  That is a reasonable burden

 6    all factors considered, your Honor, and that is our submission

 7    to you today.

 8              THE COURT:  Thank you.

 9              Did you want to say one more thing, Mr. Taber?

10              MR. TABER:  I would appreciate the opportunity, your

11    Honor.  Thank you.

12              Contrary to what Mr. Goldstein just indicated, the

13    corporation, IMS, does not have the information he seeks.  The

14    information he seeks resides in the heads of the people who

15    work on the project.  The questions he wants to asks are

16    questions like, what did you do and why did you do it, why

17    didn't you do other things that I think you should have done,

18    and how did you make the choices you made here.

19              THE COURT:  Is that true?  I don't mean to interrupt.

20    Is that true?  Do you really just want to ask the limited

21    questions you asked a moment ago about communications that were

22    made or do you really want to ask about the formulation of the

23    study and why it was done and how it was done?

24              MR. GOLDSTEIN:  Really the only question about the

25    formulation of the study, your Honor, relates to the
```

E8d6proo

1   assumptions that were evidently, and we understand, to have

2   been imposed by Ono and therefore not the subjects of any study

3   by IMS and that was what prices to use in sales estimates,

4   which we understand to have been imposed by Ono and sent.  We

5   want to confirm that and we want to know why.  And the second

6   is why did you use to quantify the universe of cancer patients

7   Statistics A rather than Statistics B, was that directed by

8   Ono, or did you have a reason about reliability about

9   statistics or otherwise to choose one rather than the other.

10  The methodology of carrying out the report is not a subject of

11  the examination, your Honor.  That is why we say whether it is

12  for the educated witness or witness in Japan, we're not asking

13  a lot.

14          MR. TABER:  Your Honor, I am going to read from

15  Mr. Goldstein's own declaration that he submitted to your Honor

16  here and what he says paragraph 21 is "Therefore, to have the

17  chance to question IMS about why it made those assumptions is

18  important."  That is in paragraph 21.  In paragraph 23 he says,

19  We do wish to determine if IMS did certain types of analysis

20  and for certain reasons omit that analysis from the report."He

21  goes on to say that we want the witness "to be able to explain

22  what was done and what were the conclusions."  He then has some

23  more specific questions but those are the broad sweeping

24  questions that in his declaration he told your Honor and he

25  said the same thing I believe to the tribunal he intends to ask

E8d6proo

this witness about.  We all know that when he asked the first

question, there is going to be a follow-up question depending

on what the answer is.  Then there will be further follow-up

questions, but he is talking to someone who doesn't know the

answers.  Because at most they have the hearsay from having

questioned the people who do know the answers.  That is exactly

the distinction here, your Honor, that the cases focus on.

One of the cases we cited for your Honor is a case

called Sara Lee Corp. v. Kraft Foods, Inc., 276 F.R.D. 500

from the Northern Strict of Illinois in 2011.  The Court there

draws this very distinction and says that when you are talking

about topics such as, quote, the corporations official position

as to, quote, corporate policies and procedures or the

corporation's opinion about whether a business partner complies

with the terms of contract, close quotes, that is proper Rule

30(b)(6) examination of corporate policies, corporate level

decisions.  But the Court goes on to say, quote, Nonparty Rule

30(b)(6) testimony is less appropriate for proving how the

parties acted in a given instance, closed quote.  That is what

we're dealing with here.

Mr. Goldstein wants to know because he says it is

important to his case how IMS acted in a particular instance,

why it did what it did, why it didn't do other things that he

thinks it should have done.  That is where Rule 30(b)(6) is

inappropriate, where educating a witness who didn't participate

E8d6proo

1   in any way, shape or form in the facts is a different

2   situation.  The BBC, case, your Honor, they wanted to know

3   information and the Court said, The information you want is

4   known by people who are all in London.  The people here in

5   Washington D.C. are news reporters.  They don't know how this

6   particular broadcast that you are challenging was assembled,

7   why there were out-takes not included.  They don't know

8   anything about that and to ask them about it because they

9   happen to be within a hundred miles of this court is wrong.

10  We're quashing the subpoena.  This Court should do exactly the

11  same.

12         Last point, your Honor.  The case from Judge

13  Scheindlin that Mr. Goldstein spent so much time on.  The

14  questions that she allowed to be asked of the witness from Bank

15  Hapoalim who was to be educated were extremely narrow.  They

16  went to a single issue.  Did the Israeli government give a

17  particular instruction to the bank or not.  It was a yes-no

18  question.  That is what she allowed to be answered by a witness

19  to be educated here in New York.  It wasn't a course of conduct

20  question.  It wasn't a question for 750 hours of consulting

21  work.  It was a question to a single discrete fact.  That is

22  okay for Rule 30(b)(6) depositions and maybe the argument can

23  be made that that is okay for trial in an arbitration.  But

24  what year talking about is different in scope and in magnitude

25  and in burden and that is why the subpoena should be quashed,

E8d6proo

1     your Honor.

2           THE COURT:  Why don't we do this:  Why don't we take a

3     brief recess.

4           MR. GOLDSTEIN:  Your Honor, may I have one moment?

5           THE COURT:  Sure.

6           MR. GOLDSTEIN:  I think the arguments come down to

7     what I say I want to ask versus what Mr. Taber insists that I

8     really think I might ask.  What I presented to your Honor was

9     fairly narrow.  If the answer to the question is:  Did you

10     study -- did you not study the price because IMS -- Ono told

11     you not to study the price.  Yes.  I will ask:  Did you study

12     the price anyway?  The answer to that might be no.  If the

13     answer is no, it certainly is no burden to find out.

14           THE COURT:  You had said earlier you were going to ask

15     why questions, which I don't think are narrow.  Did Ono direct

16     you to do this.

17           MR. GOLDSTEIN:  One why question.  Why did you select

18     Data Point X rather than Data Point Y, period.  The followup

19     question might be:  Did you study under Data Point Y as an

20     alternative?  Answer, no.  Alternate answer yes.  If the

21     alternative answer is yes, the detail of it should be in

22     documents that are going on produced.  It is not going to be a

23     subject of oral testimony.  Similarly if the answer is yes, we

24     did a price study under the alternative pricing of what they

25     thought the price would be, it will be in documents.  It is not

E8d6proo

1   the subject of oral testimony.  The documents can be produced.

2   Obviously if they did a study of price, it is a highly

3   documentary thing and they can provide it.  If the answer is

4   no, the answer is simply obtained.  It doesn't take much

5   education.  We're done.  That is not burdensome.  I submit to

6   your Honor that Mr. Taber is putting the parade of horribles in

7   your mouth and trying to say this is American litigator who is

8   not able to resist and asking questions into the weeds.  I have

9   been very specific about what our interests are and that is why

10  it is not burdensome.

11           THE COURT:  Thank you.  We'll take a brief recess.

12           (Recess)

13           THE COURT:  Having considered the parties' submissions

14  and arguments, I'm going to deny Progenics' motion to compel

15  compliance with the arbitral witness summons.  I have not been

16  asked to decide whether a witness in Japan could be compelled

17  to testify by video before the arbitrators.  Instead, the

18  narrow issue before me is whether, by analogy to Rule 30(b)(6),

19  IMS can be compelled to educate an employee in New York about a

20  Japanese for the purpose of testifying before the arbitrators.

21           I don't think there is a dispute that it would be

22  unprecedented to order a non-party to comply with an

23  arbitration subpoena by designating a representative and

24  educating him or her in the same manner as 30(b)(6) deponent.

25  I find that I have no legal basis to do so here.

E8d6proo

1        For Progenics' argument to succeed, I would have to

2   find, first, that 30(b)(6) requirements apply to arbitration

3   subpoenas and, second, that this particular subpoena is not

4   unduly burdensome.

5        As the parties are aware, the enforcement of

6   arbitration subpoenas is governed by Section 7 of the Federal

7   Arbitration Act, which provides that the district courts shall

8   enforce such subpoenas "in the same manner provided by law for

9   securing the attendance of witnesses in the courts of the

10  United States."  The Act also provides that such subpoenas

11  "shall be served in the same manner as subpoenas to appear and

12  testify before the court."  The text of the statute therefore

13  requires courts faced with arbitration subpoenas to apply the

14  requirements for subpoenas to testify in court.  See Dynegy

15  Midstream Servs. v. Trammochem, 451 F.3d at 94.

16       This understanding is reinforced by the fact that

17  Section 7 does not authorize arbitration subpoenas for

18  pre-hearing discovery.  See Life Receivables Trust v. Syndicate

19  102 at Lloyd's of London, 549 F.3d 210, and Odfjell ASA v.

20  Celanese AG, 328 F. Supp. 2d at 507.

21       There is no indication in the Federal Rules of Civil

22  Procedure themselves that Rule 30(b)(6) applies to a subpoena

23  that compels a witness to testify at trial.  Although this is

24  an open issue in the Second Circuit, and there are some

25  district court cases to the contrary, the only circuit courts

E8d6proo

1    to have addressed the issue support IMS's view of the law, and

2    their reasoning is persuasive.  See Brazos River Authority v.

3    GE Ionics, Inc., 469 F.3d at 434 (a 5th Circuit case from 2006)

4    and Donoghue v. Orange County., 848 F.2d at 932 (a 9th Circuit

5    case from 1987).  See also Hill v. National Railroad Passenger

6    Corporation, 1989 WL 87621, and Dopson-Troutt v. Novartis

7    Pharmaceutical Corporation, 295 F.R.D. at 539-40.

8            I recognize that the testimony of the witnesses

9    involved in the IMS study is important to Progenics.  I also

10   recognize that, although I do believe it would be burdensome

11   for IMS to educate a witness in New York about the study at

12   issue, IMS could largely avoid that burden by having a witness

13   in Japan testify by videoconference.  Ultimately, though, I do

14   not believe that I have the authority to order the specific

15   relief Progenics requests.

16           MR. GOLDSTEIN:  This, your Honor.

17           MR. TABER:  Thank you very much, your Honor.

18                              o0o

19

20

21

22

23

24

25